JOHN W. WOOD, use of JAMES WALLACE, v. Q. D. GIBBS, Adm'r of JAMES R. WEST.

1. PRACTICE AND PLEADING: WHERE AMENDED DECLARATION FILED, PLAINTIFF NOT ENTITLED TO JUDGMENT FINAL, ON OVERRULING A DEMURRER TO THE ORIGINAL.—If before the defendant's demurrer to the declaration is disposed of, the plaintiff file an amended declaration upon the same cause of action, and the defendant plead thereto, the subsequent overruling of the demurrer, does not entitle the plaintiff to a judgment final on the original declaration, upon the defendant's refusal to file an affidavit of merits in his defence. In such a case, the amended declaration supersedes the original, and the disposition of the demurrer is merely matter of form, and the cause being at issue on the amended declaration, there is no necessity for further pleading.

2. PRACTICE: DISCRETIONARY WITH THE COURT TO ALLOW PLAINTIFF TO INTRODUCE EVIDENCE NOT IN REBUTTAL, AFTER DEFENDANT HAD CLOSED.—It is not error, for the court to refuse the application of the plaintiff to introduce, after the defendant has closed his case, other evidence, which is not in rebuttal of the defendant's evidence, but which merely goes to sustain the plaintiff's case as originally made out. The introduction or exclusion of such evidence, at that time, is a matter of discretion in the court, which cannot be assigned as error.

3. SAME: EVIDENCE.—In an action on a bill of exchange, evidence which tends to show an excuse for the plaintiff's failure to present the bill for acceptance, in a reasonable time, should be introduced by the plaintiff in opening his case; and, if he fail to do so, the court may refuse, in its discretion, to permit him to introduce it afterwards.

4. BILLS OF EXCHANGE: CONTRACT OF DRAWER, IS TO PAY WHERE THE BILL IS DRAWN.—A bill of exchange, drawn in this State on a party residing in another, does not impose any obligation on the drawer, in case of the failure of the drawee to accept it, to pay the bill at the place where the drawee resides; but the contract of the drawer, is to pay the bill in the place where it is drawn.

5. SAME: CONFLICT OF LAWS: DRAWER IN THIS STATE MAY SET UP DEFENCES AGAINST INNOCENT HOLDER.—As between the drawer and payee, or subsequent holder of a bill of exchange, the contract of the drawer, as to the form, nature, obligation, and effect of the bill, is governed by the law of the place where it is drawn, although the bill is drawn on a party residing in another State, and

is intended to be paid by the drawee at the place of his residence; and hence, where a bill is drawn in this State, on a person residing in Louisiana, who refuses to accept or pay it, the drawer may set up as a defence, to an action on the bill brought by an innocent holder for value and without notice, failure, or want of consideration, &c., in the bill, as provided in the statute. Rev. Code, Art. 2, p. 355.

6. SAME: CASE EXPLAINED.—The case of *Fellows* v. *Harris,* 12 S. & M. 462, reviewed and explained.

7. CONTRACT: CANCELLATION: WHEN CANCELLATION PRESUMED.—Where two bills of exchange are drawn (but not in sets), for the same consideration, and the drawer afterwards demands of the payee a cancellation of the contract, and a surrender of the evidences of debt, and thereupon the payee delivers up one of the bills, it will be considered, unless he expressly dissent to the proposition to cancel, that he acquiesced in it, and neither he nor his assignee can recover upon the bill which was retained by him.

8. BILLS OF EXCHANGE: WHAT EXCUSE FOR NON-PRESENTMENT.—The fact that the drawer of a bill of exchange has no funds in the hands of the drawee, and no reasonable ground to expect that the bill will be accepted and paid, is a valid excuse for a failure to present it for acceptance and payment.

9. NEW TRIAL: WILL NOT BE GRANTED FOR IMMATERIAL ERROR IN INSTRUCTIONS. —This court will not set aside the verdict of a jury and grant a new trial, because the court below, at the instance of the successful party, gave an instruction abstractly correct, but not applicable to the evidence, if it be apparent that the instruction had no effect upon the jury in finding their verdict.

10. SAME: NOT GRANTED WHEN EVIDENCE CONFLICTING: RULE ON THIS SUBJECT. —In cases, when the evidence is conflicting, and the verdict depends upon the weight to be given to the testimony of the respective witnesses, and upon inferences to be drawn from the facts proven and the conduct of the parties, a new trial will not be granted, except for clear and manifest error in the rulings of the court.

ERROR to the Circuit Court of Yazoo county. Hon. William Cothran, judge.

The original declaration in this cause, was filed to the May term, A.D. 1856, and sought to recover, in the name of Wood, for the use of Wallace, the sum of $5000, for professional services, rendered by Wood, for West, the defendant, in probating the will of W. E. Parker, and "for which," it was alleged, "that the said defendant, on the 3d day of February, A.D. 1856, made and delivered his order on his merchants, Cuddy, Brown & Co., of New Orleans, which was duly presented, and protested for non-payment; of which the defendant had due notice." At the return term, the de-

fendant. demurred to this declaration; but no action was taken on the demurrer, until the November term, 1857, when it was overruled. At the May term, 1857, the plaintiff, under leave granted, filed an amended complaint, to recover the bill mentioned in the original complaint, and which was in the usual form of a declaration at common law, on a bill of exchange. To this, at the same term, the defendant filed three pleas:—

1st. A general denial of all the allegations in the amended complaint.

2d. That the bill sued on was void, because it was made on Sunday.

3d. The general issue, with notice that he would rely on the following special matters of defence:—

" 1. That the draft was given on the Sabbath.

" 2. It was given to procure money for the use of the drawer.

" 3. If given for the use of the payee, it was for services to be rendered, which were never rendered; that there was no consideration, or failure of consideration.

" 4. The drawer of the draft was not, at the time, in a condition, owing to sickness, or other causes, to make a valid contract."

The plaintiff demurred to the second plea, and his demurrer was sustained, at the November term, 1857.

Upon the overruling of the defendant's demurrer to the original complaint, at the last-mentioned term, the plaintiff moved the court for final judgment, because the defendant had failed to make an affidavit of merits in his defence. This motion was overruled, and the plaintiff excepted.

At the May term, 1858, the cause was submitted to a jury, upon the issues joined on the amended complaint, and the pleas thereto.

On the trial, the plaintiff read in evidence the bill of exchange sued on, and which is in the following words and figures:—

" $5000. Messrs. Cuddy, Brown & Co., New Orleans, please pay John W. Wood, five thousand dollars.

" (Signed) JAMES R. WEST.
" February 3d, 1856."

He also read in evidence, the act of protest, by which it appeared, that it was presented to the drawees for payment, on the 12th day

of April, 1856, and protested for non-payment. He also proved that due notice of protest was given to West, the drawer. He then read in evidence the answers of Sheppard Brown to the interrogatories-in-chief, and contained in his deposition taken on behalf of plaintiff: from which it appeared that witness was a member of the firm of Cuddy, Brown & Co., the drawees, and that West had no funds in their hands when said bill was presented for payment. Plaintiff then proved that Cuddy, Brown & Co., were in good credit in the spring of 1856 ; and that defendant, West, was solvent, and the owner of a large real and personal estate in Holmes county, and closed his case.

The defendant then proved, by T. R. Griffin, that he was in West's room, in Lexington, about the date of the draft, and saw Wood there. Wood was writing, and handed West a paper ; West made some remark, not recollected by witness, and Wood said he would alter it, and pushed it aside, and commenced writing on another piece ; witness then left the room, and returned in about two hours ; as he approached the room, he saw Treadwell and Wood, standing near the door, in conversation ; they were talking about a draft, and Treadwell requested Wood to give it up ; Wood made some reply, which is not remembered by the witness, and then turned round and went to the bed where West was lying, and handed a paper towards West, but Treadwell took it, and opened and read it aloud in witness's hearing ; which gave him to understand that it was a draft for $5000 or $6000. Treadwell then burnt the paper. Witness thinks the paper, from its appearance, was the same which Wood pushed aside when witness first visited the room. Witness further stated, " that West was lying in the bed, and that he saw that West was right smartly drinking." Witness " thinks Wood was also drinking,—judging from what he has since seen." " On that evening, West seemed sometimes to talk rationally, and at other times he did not."

To the introduction of this evidence, the plaintiff objected, on the ground that the consideration of the bill could not be inquired into, in the hands of an innocent holder ; but the court overruled the objection, and the plaintiff excepted.

B. T. Owen, for defendant, stated, that about 1st February, 1856, Wood offered to sell him the bill of exchange sued on : Wood

said that West had drawn the bill to pay for the prosecution of Ogle; and in the same conversation he said something about services rendered by him for West, in probating the will of W. E. Parker, though witness cannot recollect what it was; Wood was under the influence of liquor. Witness further stated, that he occasionally dealt in the purchase of bills of exchange, and he thought two months and nine days an unusual period to hold a bill payable on demand, without presentation, though in some instances it was done; that the usual time of correspondence, in 1856, between New Orleans and Lexington, Mississippi, was from twelve to fourteen days.

B. W. Treadwell, for defendant, stated, that about 1st February, 1856, he went with West to Lexington; that West was in great distress of mind about the death of his son, who had recently been killed by Ogle; that Ogle had then just been arrested; that West went to Lexington on that business, and witness went with him to take care of him and attend to his business. Witness and West stopped at Beall & Johnson's hotel, and during their stay, he regarded West as incapable of attending to business.

That, on Sunday, the 3d February, Wood came to their room, at the hotel, and he then requested Wood to deliver up the draft for $5000, which he had got from West, stating to him in the presence of West, that he (West) desired it; after talking a little, Wood handed to West a draft drawn by him for $5000, which witness took and burnt.

On cross-examination, he stated, that he did not see West drink any on their route to Lexington, and had never seen him take a drink; but he thought West was under the influence of liquor before he left home, and during all the time he was in Lexington, so as to disqualify him from attending to business. Witness also stated, that Wood, at the time he delivered up the draft, was considerably under the influence of liquor, " and so was he (the witness)." He further stated, that on Monday, the 4th February, West purchased a tract of land, through John W. West, for witness, and gave his draft for the purchase-money, which was afterwards paid. He also stated that he was the family physician of West, and "knew his constitution well;" and from "his knowledge of his constitution, he knew he was incapable of attending to business whilst at Lexing-

ton." Witness afterwards heard West say to Wood, that he had paid him $275 for the Parker will case, and that Wood replied that he had not paid so much; West repeated that he had; and Wood then said, "If you say so, it is all right."

Q. D. Gibbs stated, that previous to January, 1856, he had been consulted by West about probating the Parker will, and had given him such advice as would enable him to probate it, and that he charged $50 therefor.

Walker Brooke stated, that on the 2d February, 1856, he was consulted by West, in relation to the prosecution of Ogle, and that he was then under the influence of liquor, and that witness did not consider him capable of attending to business; that he made no contract with him, but postponed the matter until the following Monday; but he was in no better condition on that day. On Tuesday witness made a contract with him to prosecute Ogle, and charged therefor, $500. Wood did not assist in prosecuting Ogle, but defended him. Witness said he would charge from $25 to $50 (if he charged anything) for probating a will, where there was no contest. He further stated, that he never saw West drink intoxicating liquor, though he had frequently seen him under its influence.

John J. Hooker stated, that a proper fee for probating a will, when there was no litigation, and the estate was large, would be from $50 to $150; and that he was also employed to prosecute Ogle, at a fee of $500.

Levi Gibson stated, that he had heard Wood say, that the bill in suit was given to him by West, for services rendered by him in relation to the Parker will, and also for services to be rendered by him in the prosecution of Ogle. And another witness, Green, stated, that he had heard Wood say that West had paid him $250, for probating the Parker will.

The plaintiff, in reply, introduced Watt Johnson, who stated, that he was one of the proprietors of the hotel, at Lexington; and that, about 1st February, 1856, West lodged there several days. Witness frequently saw West during his stay, and was frequently in his room; he considered West capable of attending to business during that period. When West was about to leave, he requested witness to make out his bill, and send it to his room; which was done. After the bill was sent to West's room, he sent for witness,

and disputed some items in it, and had them corrected. West was particular in scanning the bill, as he was on all occasions, and remembered very well when he came, and what he got. He settled his own and Treadwell's bill, without any assistance from Treadwell. Witness never saw West drink, and it was a matter of surprise to every one, how he got his liquor, as no one ever saw him drink, or knew him to buy liquor.

A. G. Otey was next introduced, and he stated that he was then, and had been for twenty years, Probate Clerk of Holmes county. The Probate Court of that county was in session on the fourth Monday of January, A.D. 1856, and continued in session for four days; that West was in the court-room the first day of the term, and was exceedingly anxious to have the will of W. E. Parker probated. Wood was also in court, as West's counsel. Witness had previously informed West and Wood, that there was no trace of said will ever having been probated; but Wood, on Sunday before the court met, procured the key of the office from witness, and spent the greater part of the day in searching the records for proof to probate the will, and, by his reserches, found an order made in December, 1835, probating the will. (This order is copied in the record, and recites that the will had been produced and probated, and then grants letters testamentary to the executor therein named.)

Wood filed a petition, asking the court to admit the will to record, and to probate the same on the order above mentioned. The court was disinclined to do so; and a great portion of the term was consumed in attending to the matter; Wood argued the application before the court one whole day, and finally the will was probated and recorded. (The order to this effect is set out in the record.) The will is also copied in the record, and bequeaths the whole of the testator's estate to his widow during her life, and the remainder to West (her son and step-son of testator). The last witness thought the value of the property thus secured to West was about $200,000. This witness also stated that he knew West well, and was intimately acquainted with him for a number of years, and that "he was altogether rational and capable of attending to business during the session of the court before referred to."

John W. Wood, the nominal plaintiff (having been released by

the usee), testified : that West stated to him that the property bequeathed by the will had generally been regarded as the property of his son, who had then recently been killed ; and, as his son was now dead, he was afraid his (the son's) father-in-law would make an effort to get the property and carry it to Missouri, and for this reason he was very anxious to have the will of W. E. Parker probated. West employed witness to probate the will ; and witness spent a day or two in searching the records, and finally found the order of December, 1835 ; that he and West desired much to have the will probated on this order ; that the only surviving witness resided in Alabama, and West was very unwilling to send the original to that State ; and stated that for special reasons he desired very much to have it probated at that term. Witness spent a greater part of the term in attending to the matter ; the judge at first was much disinclined to probate the will, but finally did so. Nothing was said by him or West as to the amount of the fee. West went home and returned on the next Saturday ; the next day witness called on him at his room at the hotel, found him cheerful and lively, and entirely rational ; he was not drinking, though exhilarated ; witness thought he had been taking opium. Witness did not see him drink that day. After talking a while, West asked witness what he should pay him for probating the Parker will ; and witness replied, that he would leave that matter entirely to West, remarking to him that, by the probate of the will, he had become possessed of the finest estate in Holmes county, and one of the finest in the Yazoo valley. West then said he would give him $5000, which was just two and a half per cent. on the value of the property secured by the will, and told witness to sit down and draw a draft for that amount, which he did, and West signed it. The pen used being bad, the bill was badly written, and the paper was somewhat ragged and torn, and, in tearing it off, one corner of the bill was torn off; West told him to draw a new one, which he did, and West signed it, and it is now the draft in suit ; " witness not regarding the mutilated draft as important, put it in his blanket coat pocket."

Witness then left, and came back in the evening and found Treadwell in the room. Treadwell, in the presence of West, asked witness to give up the draft ; witness then " run his hand in

his pocket and pulled out the mutilated draft and handed it to West; Treadwell took it and threw it in the fire." He also stated that Wallace, the usee, had paid him $4600 for the draft ; that West had paid him $50 for attending to some business in relation to his son's estate, but had not paid him anything for probating the will.

Cross-examined : Witness gave up the mutilated draft, " because he believed that West did not want the draft last drawn to be given up, and he wished to get rid of the pragmatical interference of Treadwell." Witness " knew that West did not like the pragmatical and officious intermeddling of Treadwell in his business, and he handed over to Treadwell the mutilated draft, because he wanted to get rid of him, believing that West understood the matter, as he knew he had signed two drafts." Witness further stated that Treadwell was drinking, and continued drinking, all the time he was with West in Lexington. Witness also stated, that, on the following morning, Walker Brooke asked him to deliver up the draft, stating he was acting by West's request, and further, that West said the draft would not be paid, as he had no funds in New Orleans.

Witness further stated, that the reason he defended Ogle was, that West had informed him that he did not want his services in the prosecution.

The plaintiff then proposed to read the answers of Sheppard Brown (whose answers in chief he had read in opening the case) to the cross-interrogatories ; but the defendant. objected, upon the ground that they could not be read by the plaintiff at that time ; the court sustained the objection, and the defendant excepted. The tendency of this evidence was to show that West had no reasonable ground to suppose that the draft would be accepted or paid by the drawees.

This was all the evidence.

The instructions are sufficiently set out in the opinion of the court.

The defendant had verdict and judgment, and the plaintiff moved for a new trial, which was refused, and he excepted and made out this writ in error.

*H. S. Allen,* for plaintiff in error,
Cited *Fellows* v. *Harris*, 12 S. & M., 462; 7 Barbour's S. C. R.

182; Story on Bills, §§ 60, 188, 189, 231; 3 Kent. Com. (4 edit.) p. 79.

*Davis* and *Hill*, on same side.

This is a Louisiana bill of exchange, and not governed by the anti-commercial principle of our statute; and the true rules, as to inquiry into the consideration of commercial paper like this, and upon whom the burden of proof rests, are these: *prima facie*, the plaintiff is a holder for value. Defendant, however, may impeach the consideration; then, the burden of proof rests on plaintiff, to show that he gave value for the instrument; and, upon this proof, he is again within the protection of the commercial law, unless the defendant again shows, on his part, that, although plaintiff gave value, he bought with notice of the infirmity of the papers. The instrument being offered in evidence, the *onus* rests on defendant to impeach; this being done, then the *onus* is thrown on plaintiff, to show he gave value; then the *onus* is again shifted on defendant, to show that plaintiff had notice, otherwise plaintiff must recover. Story, Chitty, and all writers on Commercial Paper.

These principles are, in effect, asserted in plaintiff's instructions, and granted by the court; and plaintiff, having given value, and without notice of infirmity, was entitled to a verdict, unless there be some other difficulty in the way. And this is supposed to exist by the third instruction granted defendant. Now it might be that the holder would not be protected by the commercial principle, although innocent and without notice, if the paper never had any valid existence; but if it once has a valid existence, he is protected. If the paper had been founded on a usurious or gaming contract,—which are void by the common law,—this void paper would continue to be void in the hands of the innocent holders, because it had never any valid being. But the present bill had been executed by West, and delivered to Wood, some time before Treadwell came in; and, in fact, Wood had gone off, and it was on his return, that the supposed cancellation took place, the bill then being in Wood's hands. We insist, then, that, having once a valid existence, the innocent holder is protected, although West may have thought that the draft in suit was redelivered. The third instruction, then, was improperly granted; and, as there is a special bill of exceptions

taken to the rulings on the instructions, if this, or any other, instruction is erroneous, the case will be reversed, though it might be otherwise held, if the case were brought here solely on a motion for new trial.

The instruction, asserting that the legal title passes by indorsement, &c., is error, for two reasons: 1st. Not being payable to order or bearer, suit could only have been brought as it was. As a Mississippi bill, whether payable to bearer or order, if indorsed, the legal title vested in the indorsee; but it is a Louisiana bill, and not assignable. 2d. There is no evidence of any indorsement of the bill. No indorsement was read to the jury, or proved. If suit is brought by the indorsee, it is not necessary for him to prove the handwriting of indorsers, unless denied under oath. But this rule does not apply, where an indorsement, not set forth in the pleadings, is relied on as a defence : in such case, it must be proved as a fact. The instruction was erroneously granted; there is no evidence to support it. True, the protest gives a copy of the note as indorsed. The general custom is, to indorse bills, when sent to a distant city for collection; but the indorsement on the bill may have been stricken at the trial, or before it; the record contains not one scintilla of proof that there was any indorsement on the bill at the time of the trial.

The court erred in instructing, that two months and nine days was an unreasonable time for the presentation of a sight bill. The law lays down no definite time ; it was a question for the jury.

*Gibbs* and *Wilkinson*, for defendant in error.

I. The first error assigned is, that the court erred in not rendering final judgment on pleadings, in favor of plaintiff below, at the November term, 1857.

The plaintiff below, filed his complaint to the May term, 1856, of the Circuit Court.

The defendant, at that term, appeared and demurred to the complaint, and the plaintiff joined in demurrer.

At the May term, 1857, the plaintiff filed his amended complaint; and, at the same term, the defendant appeared, and pleaded the general issue, and two special pleas; the second of which pleas was demurred to, and demurrer sustained.

For defendant in error, we contend,—

First. That the filing of the amended complaint, by plaintiff below, was, of itself, a confession of defendant's demurrer to the original complaint.

Secondly. The pleading of an issuable plea, by defendant, to the amended complaint, was a waiver of his demurrer to the original complaint, and it was unnecessary for the court to have decided it.

II. The second error assigned, is, that the court erred in not permitting plaintiff below to read the cross-interrogatories propounded to Sheppard Brown, and the answers thereto.

Plaintiff, in opening his case, had read the answers of this witness to the interrogatories-in-chief, without offering to read the cross-interrogatories and answers; and, after offering other testimony, closed.

The defendant then introduced his testimony, without regarding the depositions, and failing to read the answers to the cross-interrogatories, closed his case. The plaintiff, in conclusion, offered to read these cross-interrogatories and answers, as rebutting testimony, to which the defendant objected, because it was defendant's own testimony, and plaintiff could not be allowed to use it at that time. The objection was sustained, and this is assigned for error.

We contend, that the testimony was not rebutting testimony. The suit was by the holder against the drawer of a protested bill. In order to entitle him to recover, and to make out his case in the first instance, it was necessary to prove, that the bill of exchange was presented for payment in a reasonable time, or that the drawer had no funds in the hands of the drawee, and no right to expect that his bill would be met. This was the proof which it was incumbent on the plaintiff to make in the first instance, in order to maintain his suit; and, having failed to make it at that time, he seeks to make it as rebutting testimony, after the defendant had closed his case. We contend, that the testimony was original, and not rebutting testimony; and, as such, should not have been received at that time. We say further, that the application to read the cross-interrogatories and answers at that time, was a matter addressed to the sound discretion of the court, and similar in all respects to an application to recall and re-examine a witness, by a

party, after he has been once examined, and dismissed from the stand. If the party against whom the witness is called, declines to cross-examine, it is a matter in the discretion of the court, to allow him to be recalled, and is matter in which this court will not interfere, except when there has been flagrant abuse.

III. The third error assigned, is, in admitting the testimony of Griffin,—the plaintiff below contending, that as between the usee in this action and the defendant, the consideration of the bill of exchange sued on, could not be inquired into.

We take the ground, that this contract was a Mississippi contract, and falls within our anti-commercial statute, and is not governed by the decision in the case of *Fellows & Co.* v. *Harris.* The bill of exchange sued on, was drawn in Mississippi, on a house in New Orleans, and protested for non-acceptance.

In Story on Bills of Exchange, p. 150, § 131, it is said, that in respect to foreign bills of exchange, they are generally as to their validity, nature, interpretation, and effects, governed by the laws of the state or country where the contract between the particular parties has its origin. "The contract of the drawer is, as to the form, the nature, the obligation, and the effect thereof, governed by the law of the place where the bill is drawn in regard to the payee, and any subsequent holder, the contract of the indorser, &c.;" so that very different contracts, of very different natures, and of various obligations, may arise between different parties under one and the same bill of exchange, according to the place where the particular transaction takes place. And in section 153, he puts a case precisely like the one at bar; and, after asking what rule is to govern in case of dishonor, answers: in each case, the *lex loci contractus.* "The drawer is liable on the bill, according to the law of the place where the bill was drawn, and the successive indorsers," &c. And in section 154: "The drawer and indorsers do not contract to pay the money, in the foreign place, on which the bill is drawn, but only to guarantee its acceptance and payment in that place, by the drawee; and in default of such payment, they agree, upon due notice, to reimburse the holder, in principal and damages, at the place where they respectively entered into the contract."

But, we think that Griffin's testimony was admissible, because it

tends to show, that at the time the bill of exchange sued on was given, West, the drawer, was incompetent to contract, by reason of imbecility of mind. *Newell* v. *Fisher*, 11 S. & M. 431. The contract of persons *non compos mentis* from age, or imbecility, or personal infirmity, are utterly void. Story on Bills of Exchange, 127, § 106.

We also think, that Griffin's testimony was admissible, because it tended to show that the bill of exchange sued on, was cancelled in his presence. We will examine this branch of the cause, when we come to argue the instructions.

IV. The fourth error assigned, is, that the court erred in refusing to permit the letter of Sheppard Brown, the drawee, to be read as evidence. We say Brown was a competent witness (his deposition has been taken in this cause); his letters are, therefore, clearly not competent testimony.

V. The next error assigned, is, that the court erred in granting the 1st, 4th, 5th, 6th, and 7th instructions asked for on the part of the defendant.

1st inst. The first instruction, or the principle embraced in it, having been already argued under the third assignment of error, we will not again revert to it.

4th inst. The fourth instruction is, in substance, that if two drafts were originally drawn, and subsequently one was delivered up as a cancellation of the contract by Wood, and so understood by the drawer, the law is for defendant. Upon this point, see 2 Parsons on Contracts, 189, 190, 191.

5th inst. The court, in the fifth instruction, decided that the draft sued on, was not presented and protested in a "reasonable time." We say this was a question of law, properly for the decision of the court (2 Parsons, 173, 174, and notes), and depends, in each case, upon the circumstances, as the court instructed in the seventh instruction for the plaintiff. Whether the presentment and protest was made in a "reasonable time," in this case, depends on the testimony of Owen.. He proved that he lived at Lexington, Mississippi, where this bill was drawn; and that two months and nine days,—the time this bill was held without presentation,—was an unusual time; that the usual time for correspondence between Lexington and New Orleans, in 1856, was twelve or fourteen days.

6th inst. The sixth instruction was, that the plaintiff must have the legal title, in order to entitle him to recover. See, on this point, *Beard* v. *Griffin*, 10 S. & M. 586.

7th inst. The seventh instruction was, that if the bill of exchange sued on, was given partly in consideration of services to be rendered, in the prosecution of Ogle, and that afterwards Wood, by request of West, did not prosecute him, and defended him, this was a rescission of the contract, to that extent. 2 Parsons on Contracts, 189–90. The testimony in the record, shows that Wood, the nominal plaintiff, was paid the value of his services, in the matter of the will of Parker. And it is in connection with that proof, and the proof in relation to his connection with the Ogle case, that this instruction is to be viewed.

VI. The sixth and last assignment of error is, that the court erred, in not granting the motion of plaintiff for a new trial.

For the defendant in error, we hold that this motion was properly overruled. Stephen on Pleading, lays down the doctrine, that if one or more issues be produced; if the decision, whether of law or fact, be in the defendant's favor, as to any one, he is entitled to judgment, in respect to that subject of demand to which the successful plea relates, though he fail as to the remainder; and if the successful plea was pleaded to the whole declaration, he is entitled to judgment generally, though the plaintiff should succeed as to all the other pleas. Cited in 2 Tucker's Com. 260.

Now, the entry in the record shows, that the complaint, and amended complaint, and the demurrer to the complaint, and all the pleas, and the demurrer to the second plea, were all before the court at the same time; and if there be error in that judgment, it is not to the prejudice of the plaintiff in error. All the rules of pleading recognize the order in which they should be pleaded; and the filing of a plea in bar, overrules, of itself, a demurrer or plea in abatement. It is true, that the court in sustaining the demurrer of plaintiff to defendant's second plea, did not enter a judgment of *respondeat ouster*, and, upon failure to answer over judgment final; yet this is not to the prejudice of plaintiff, because the only judgment the court could have pronounced on the second plea, would have been in favor of the plaintiff, as to that plea. In other words, that the making of a bill of exchange on Sunday, does not

make it void; it still leaves undetermined other distinct issues, material to the causes, the success in either of which, entitled the defendant to judgment generally. We hold the position, that when there are several issues, and the position of the cause is such, that the finding of one or more be decisive of the cause, it renders the finding upon the others immaterial. 3 Graham & Waterman on New Trials, 1396, and authorities there cited. But upon the whole record, we insist that this is not a case in which this court will interfere to grant a new trial, under its previous decisions. *Waul* v. *Kirkman*, 13 S. & M. 599; *Peck* v. *Thompson*, 23 Miss. R. 367; *Dunlap* v. *Edwards*, 29 Ib. 41; *Prewett* v. *Coopwood*, 30 Ib. 369; *Holloway* v. *Armstrong*, Ib. 504; *Corbin* v. *Cannon*, 31 Ib. 570; *Hanna* v. *Renfro*, 32 Ib. 126.

Upon the whole record, we contend, there are four points, the finding of either of which in favor of defendant, entitles him to a general judgment.

1st. It clearly appears, that the legal title to the bill of exchange sued on, was not in the plaintiff, at the time of suit brought.

2d. It clearly appears, from the evidence, that at the time the bill of exchange sued on was made, the drawer was not capable of contracting.

3d. It clearly appears that the bill of exchange sued on, was not presented for payment, and protested for non-payment, in a reasonable time; and it does not appear that the drawer had no funds in the hands of the drawee, and no right to expect his bill would be paid.

4th. It clearly appears, that the bill of exchange sued on, was cancelled by consent of parties, after the same was drawn.

We, therefore, think a new trial should not be granted.

HANDY, J., delivered the opinion of the court.

The plantiff in error brought this action to recover the amount of a bill of exchange, drawn by the defendant's intestate in these words: " $5000.    Messrs. Cuddy, Brown & Co., New Orleans, please pay John W. Wood five thousand dollars.

" *Feb. 3d*, 1856.                          JAMES R. WEST."

The defendant pleaded the general issue, with notice of failure and want of consideration, and that the drawer was not in a con-

dition, from sickness or other cause, to make a valid contract at the time the bill was drawn. Upon these issues, the case was tried and a verdict rendered for the defendant. During the progress of the trial, the plaintiff excepted on various grounds to the ruling of the court, and also moved for a new trial, which was not granted, and to that exception was also taken. These several rulings are now assigned for error here.

The first of these is, the refusal of the court to grant the plaintiff's motion for final judgment against the defendant, upon overruling the defendant's demurrer to the original declaration.

It appears that this demurrer was filed at May term, 1856; and, at May term, 1857, and before any disposition was made of it, the plaintiff filed an amended declaration, to which the defendant pleaded the general issue, with notice as above stated; and, at November term, 1857, the demurrer to the original declaration was overruled, and thereupon the plaintiff moved for judgment, unless the defendant would file an affidavit of merits in his defence, which motion was overruled. This was undoubtedly correct. The amended declaration superseded the original one, and became the ground upon which the case was to be tried. The pleas to that were filed before the demurrer was overruled, and the action upon the demurrer was therefore mere matter of form. The case then stood at issue upon the amended declaration, and there was no necessity for filing further pleas, and no application to do so.

The next error assigned, is the refusal of the court to allow the plaintiff to read in evidence, the answers to the cross-interrogatories in the deposition of the witness Brown.

This deposition was taken on the part of the plaintiff; and, in presenting his evidence, he read the examination in chief of this witness, but did not read the cross-examination. After the defendant had closed the evidence on his part, the plaintiff then offered to read the cross-examination; but, upon objection by the defendant, he was not permitted to read it.

The plaintiff had the right to read this evidence, if he thought fit, in opening his case; but, if he declined to do so, it was matter within the discretion of the court whether he should make use of it after the case was closed on the part of the defendant. The purpose for which it is stated to have been offered was, to show an

excuse for the failure of the plaintiff to present the bill for accep-
tance to the drawee in due season.    But if that was material in
the case, it should have been shown in the first instance, and it was
not evidence of a rebutting nature.    Hence it was not error to re-
fuse its admission at the stage of the case at which it was offered.
It, however, appears to be entirely immaterial to the matter in
controversy.    The defence did not rest upon the ground that the
bill was not presented to the drawee in due time; and it is clear,
from the evidence, that if it had been presented in due time ac-
cording to custom in such cases, it would not have been accepted
or paid.    No injury, therefore, is shown to the drawer from the
failure to present it, and an excuse for the non-presentation was
immaterial to the merits of the case.    This ground of error is
therefore untenable.

The third error assigned, is the admission of the testimony of
Griffin and other witnesses, to show a want of consideration for the
bill, and that it was obtained by the payee from the drawer whilst
the latter was incapable, from intoxication, of making a valid con-
tract.

In support of this objection, it is insisted that the bill upon its
face was payable in Louisiana; and, as by the law of that State,
the holder of commercial paper takes it discharged of defects upon
the grounds relied on in this case as a defence, unless it be shown
that he is not a *bona fide* holder for a valuable consideration with-
out notice of the infirmity in the paper; and, as the usee of the
plaintiff was shown to have paid value for it, and no notice of the
infirmity of it was brought home to him, it is insisted that the de-
fence set up was not competent to invalidate the title of the usee,
and that this evidence was inadmissible.

This proceeds upon the assumption, that the bill, as between the
drawer and the payee, was, according to its tenor, payable in the
city of New Orleans.    But this was not the legal effect of the bill
as it was drawn, or as it is presented in this case.    It was simply a
written request, by the drawer, that the drawees would pay the sum
of money specified in it.    If it had been accepted by the drawees,
they would thereby have become bound to pay it according to the
law of the place of acceptance, or the place of their commercial
domicil, where it was addressed to them.    But while it remained in

the form in which it now appears, it created no obligation upon the drawer to pay it in New Orleans. Story on Bills, § 154. It was merely a contract, that if the drawees did not pay it in New Orleans, he would pay it, but not in New Orleans. His obligation is governed by the law of the place where the contract was made; and as no place of payment is specified, in the event that the drawees failed to pay the bill, the place where the bill was drawn must be presumed to have been the place where it was intended to be paid in such event.

As between the drawer and payee, or subsequent holder, the contract of the drawer as to the form, nature, obligation, and effect of the bill, is governed by the law of the place where the bill is drawn. Story on Bills, § 131. And this is not affected by the fact, that the bill is intended to be paid by the drawees at the place specified for payment by them. For the contracts of the different parties, drawer, acceptor, and indorser, may all be different, as each is governed by the *lex loci contractus*. Ib. and § 153.

The case of *Fellows et al.* v. *Harris*, 12 S. & M. 462, is relied on in support of the view that this bill must be considered as payable in Louisiana, and is not governed by our laws. The bill, in that case, appears to be of the same tenor as the one under consideration; and it was indorsed by the payees to the plaintiffs. It was drawn by the drawer for the accommodation of the payees, who used it by indorsing it to the plaintiffs as collateral security for money due by the payees to the plaintiffs. The substance of the decision is, 1st, that as between the drawer and the payees, it was no objection to the consideration that he drew the bill for their accommodation; and 2d, as there was evidence rendering it uncertain whether the plaintiffs gave value for it, that the evidence offered by them to show that they made advances to the payees on account of the bill, was admissible; 3d, that if it was transferred as collateral security for a debt due by the payees, they had the right to it, and that it was no objection to their title, that the bill was taken for a pre-existing debt.

These questions did not depend upon the question whether the bill was payable in Louisiana, and governed by the law of that State; and the decision is manifestly correct under our statute in relation to negotiable instruments. Hence the remark made, at

the conclusion of the opinion, by the learned judge who delivered it, that the bill was to be regarded as one drawn in this State, but payable in Louisiana, should not have the force of a decision of the question that such a bill, as between the drawer and payee, was a bill payable in Louisiana, and governed as to its nature, obligation, and effect by the laws of that State.

We consider it clear, that the bill sued on in this case, is a contract governed by our laws; and, that under the rule established by our statute, the evidence offered by the defendant was competent.

The next error assigned, applies to the instructions granted at the instance of the defendant.

The first instruction, has reference to the incapacity of the defendant's intestate to make a contract by reason of sickness, distress of mind, or intoxication; and the objection taken to it, is the same as that made to the competency of the evidence above considered, that the bill was payable in Louisiana, and that the plaintiff's usee, as a holder of it, was not affected by its infirmity as between the drawer and payee. For the reasons above stated, this is no valid objection to the instruction.

The second instruction,—referred to as number three, and marked number four,—is in substance, that if the drawer signed two bills of the same tenor, and for the same amount and consideration, and that the payee delivered up one of them as a cancellation of the contract, and it was so understood by the drawer, that would annul the contract.

There can be no question as to the correctness of this proposition. But it is said that the evidence did not warrant it.

It is admitted that two bills were drawn in relation to the same transaction, and that both of them were retained by the payee, who wrote them. And it is in proof, that after the bills were signed, and on the same day, and whilst they were in the payee's possession, Treadwell, a friend of West, told Wood in the presence of West, that the latter had given him his draft for five thousand dollars, and wanted to get it back, and after some conversation, that Wood put his hand into his pocket, and took out the draft and gave it to the witness, who read it, and saw that it was a draft for $5000, signed by West; and then put it into the fire. Griffin testified, that on the same day on which the bill was drawn, he was present at the

interview between Treadwell and Wood, at the door of West's room, and heard Treadwell request Wood to give up the bill; and that Wood made some reply, which the witness did not recollect, and went to the bed where West was lying and handed him the paper, and that Treadwell took it, read it aloud, and then put it into the fire. Wood testified, as a witness for the plaintiff, that he wrote the two bills, and wrote the second because the first one was badly written and torn, and that West told him to write another; that he took both bills, not regarding the first as important. He admits that Treadwell, in the presence of West, requested him to give up the bill; that he handed the one first written to West, and that Treadwell took it and put it in the fire. He further stated, that he gave up that bill, because he did not believe that West wanted the bill last written, and he wished to get rid of the interference of Treadwell.

The evidence tends to show that during these transactions, West was considerably under the influence of intoxicating liquor; and from that cause, and from distress of mind on account of the recent homicide of his son, and on which account he went to Lexington where these transactions took place, that he was incapable of making a valid contract.

Under these circumstances, it was for the jury to determine, whether the demand made upon Wood for the bill, was not intended and understood to be a demand of the bill which Wood held as the evidence of debt against West, and with a view to cancel the contract created by the drawing of the bill or bills, and whether West and Treadwell were not justified in believing that Wood, in giving up the bill, surrendered all evidence of debt against West, arising from the bill or bills. It is evident that it was so regarded by West and Treadwell, and that Wood must have been aware of the object of the demand upon him. If he claimed the right to hold the bill last drawn, he should have asserted that right, under the circumstances; and having failed to do so, he must be taken to have acquiesced in the demand of all evidence of debt against West, created by the bills, and to have induced the belief, that he surrendered all claims founded on the bills. At all events, that question was fairly submitted to the jury, under the evidence, and upon the instruction under consideration.

HARVARD LAW SCHOOL LIBRARY

The fifth instruction states, that the bill was not presented for payment in a reasonable time, and therefore, that the plaintiff could not recover, unless the jury believed from the evidence, that West had no funds in the hands of the drawees, nor right to expect that it would be paid. It is objected, that the Court determined the question, as to what was a reasonable time for presenting the bill, and did not submit it to the jury under the facts shown in evidence.

But this point appears to be immaterial to the issue presented. It was clearly shown, that West, by his own acknowledgment, had no funds in the hands of the drawees when the bill was drawn, and that he had none there when it was presented; and that West, the day after the bill was drawn, made known to Wood his want of funds in the drawees hands, and that the bill would not be paid. The instruction, therefore, could have worked no prejudice to the plaintiff; and the defence rested upon grounds altogether different from the failure to present the bill in due season. If it had been a material question, whether the defendant was discharged by reason of the failure to present the bill in due time, there cannot be a doubt but that the facts just stated, brought the case within the rule stated in the instruction, and constituted a sufficient excuse for the failure to present; for he neither had funds in the hands of the drawees, nor reason to expect that it would be paid; and this was shown by his own admission. Hence, no injury could have arisen to the plaintiffs from this instruction, and it is not ground of error.

The sixth instruction states the mere abstract proposition, that if the plaintiff has transferred the legal title to a bill, he cannot maintain an action upon it. No such indorsement was here shown, and the rule stated cannot be presumed to have had any effect upon the jury, to the prejudice of the plaintiff.

The last error assigned, is the overruling of the motion for a new trial. The principal ground of error here relied on, is that the defence of want of consideration for the bill, or fraud in obtaining it, was not competent against the plaintiff's usee, as a *bona fide* holder for value, and that point has already been disposed of.

As to the sufficiency of the evidence to sustain the verdict upon the material questions in controversy, the case is one showing conflicting testimony, and depending much upon the weight to be given to the statements of the respective witnesses, and upon the infer-

ences which might be drawn from facts proved, and from the conduct of the parties. Such cases are peculiarly within the province of the jury, and verdicts should not be disturbed in them, but for clear and manifest error in the ruling of the court. There being no such error in this case, and the verdict being such as the jury might properly find upon the evidence, the motion for a new trial was properly refused.

Judgment affirmed.